WELLS v. STATE.

(Court of Criminal Appeals of Texas. March 27, 1912.)

1. CRIMINAL LAW (§ 598*)—CONTINUANCE—DILIGENCE.

Where accused at a former trial did not issue process for witnesses for whose absence he claimed a continuance on the second trial, and, there having been a mistrial, he issued process for the witnesses two or three days after the first jury was discharged, the diligence was insufficient to require the granting of the motion.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1335–1341; Dec. Dig. § 598.*]

2. CRIMINAL LAW (§ 596*)—CONTINUANCE—ABSENT WITNESSES — CUMULATIVE EVIDENCE.

On a first application for a continuance because of the absence of material witnesses, the fact that their testimony was cumulative would not authorize the denial of the motion.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1328–1330; Dec. Dig. § 596.*]

3. CRIMINAL LAW (§ 595*)—APPEAL—CONTINUANCE—DENIAL.

It was not error to deny a continuance for the absence of witnesses by whom accused expected to prove threats against his life, where accused, as a witness in his own behalf, did not testify that such threats had been communicated to him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1323–1327; Dec. Dig. § 595.*]

4. WITNESSES (§ 240*) — EXAMINATION — LEADING QUESTIONS.

A witness was asked, "Now tell the jury whether or not either [of two persons named] attempted or did anything toward him [decedent]," and "Did they have anything in their hands?" "Did you have anything?" "Did you attempt to do anything?" which were each answered in the negative. Held, that the questions were not objectionable as leading.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 795, 837–839, 841–845; Dec. Dig. § 240.*]

5. CRIMINAL LAW (§ 723*)—TRIAL—ARGUMENT OF COUNTY ATTORNEY.

In a prosecution for homicide, a remark of the county attorney in argument that "it is time that murders were stopped in Dallas county" was improper.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1676; Dec. Dig. § 723.*]

6. CRIMINAL LAW (§ 728*)—APPEAL—MISCONDUCT OF COUNTY ATTORNEY.

An improper remark by the county attorney standing alone will not justify a reversal where no special charged was asked with reference thereto.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1689–1691; Dec. Dig. § 728.*]

7. HOMICIDE (§ 250*)—EVIDENCE.

Evidence held to sustain a conviction of manslaughter.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 515–517; Dec. Dig. § 250.*]

8. CRIMINAL LAW (§ 1059*)—TRIAL—EXCEPTIONS—SUFFICIENCY.

Exceptions to a charge on manslaughter "because the court erred in his definition of manslaughter, because he erred in his definition of self-defense, and because he erred in his definition of imperfect self-defense," were too general.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2671; Dec. Dig. § 1059.*]

Appeal from Criminal District Court, Dallas County; Robt. B. Seay, Judge.

Barney Wells was convicted of manslaughter, and he appeals. Affirmed.

Ed. Sewell, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

DAVIDSON, P. J. Appellant was allotted two years' confinement in the penitentiary under a conviction for manslaughter.

[1] 1. He filed his first application for continuance on account of the absence of several witnesses. He had been previously tried under the same indictment. This occurred five or six days before the trial which resulted in a conviction. About two or three days before, he was put upon trial; the second time he issued process for the absent witnesses. Three of them attended the tri-

al, the other two did not. The two absent were Lee and Sanders. By Lee he expected to prove that deceased Moody told Lee that he (Moody) had at one time attempted to and did almost kill the defendant, and that he (Moody) had been successful in not having to stand trial or be convicted for the offense, and the first opportunity that presented itself he would do a better job. He further alleges that he can prove by Lee he communicated to him (defendant) this threat through one Rachael Anderson, whom process shows is dead, but which the defendant says that he is informed on the morning of filing this application was untrue. By Sanders he expected to prove that deceased Moody told him (Sanders) that the first time he had an opportunity that he would relieve the doctors of having to cure the defendant, by which the defendant says the deceased meant that the first time he saw the defendant that he would not only shoot him again, but would kill him. It is not stated whether this was communicated to defendant or not. It is unnecessary to discuss the diligence, because we think it totally insufficient. Appellant had gone to trial in the first instance, so far as the application shows, without issuing process for these witnesses, and there had been a mistrial. Two or three days after the jury was discharged he issued process for the named witnesses. The question of diligence, however, is not so important on the first application, but, if these witnesses were important, appellant knew of the importance before his first trial, and fails to show he undertook in any manner to obtain their presence and their testimony. The testimony was of some materiality, and, if true, would aid him to some extent on his trial.

[2] He proved threats, but it would make no difference as to that, so far as his first application was concerned, that it was cumulative. From that standpoint he would be entitled to have his application granted.

[3] Viewing this question from the standpoint of the motion for new trial, the record nowhere shows anything in connection with Lee or Sanders outside of the application for a continuance. Defendant took the stand in his own behalf and testified to threats communicated to him by others, but did not mention that he had any information from either Lee or Sanders that deceased Moody had made threats against his life. Defendant did not have to take the witness stand, but, having taken it, he does not bring before the jury or put into the record anywhere any evidence of the matter that threats had been communicated to him from either of those witnesses. Had the threats been communicated, it is a fair inference and deduction from his testimony delivered on the trial that he would have mentioned that fact. So, taking the record in its entirety, we are of opinion, viewed from the standpoint of the motion for a new trial, the court did not err in refusing to grant the continuance.

2. There are several bills of exception reserved to the manner of examining witnesses. Some of these are qualified by the judge in his statement that the questions were drawn out in rebuttal as impeachment and contradiction of defendant's testimony. It is unnecessary to discuss any of those bills. They were accepted with the judge's qualification.

[4] 3. Another bill recites that, while the witness Glee was testifying, he was asked: "Now tell the jury whether or not either of them, Moody or Charles, attempted or did anything toward him? A. No, sir; not one of them didn't attempt to do a thing. Q. Did they have anything in their hands? A. No, sir. Q. Did you have anything? A. No, sir. Q. Did you attempt to do anything? A. No, sir." The objections urged were that the questions were leading and suggested the answer. Each question could be answered "yes" or "no," but they did not suggest to the witness which answer to give. If they had been answered in the affirmative, it would have taken another question to have ascertained what they did or what they had. The same may be said in regard to bill No. 6.

[5, 6] 4. There are some bills in the record complaining of the speech of the county attorney. As explained by the judge, they present no reversible error. There is one remark of the county attorney, however, that does not seem to be explained, to wit, "It is time that murders were stopped in Dallas county." This was an improper remark, but there was no special charge asked in regard to it, and, standing alone, while entirely improper, we would not feel justified in reversing for such remark.

[7] 5. The evidence, we think, from the state's standpoint fully justifies the conviction. In fact, we are little at loss to know why the jury gave such a mild punishment. From the defendant's standpoint, the jury should have returned a verdict of not guilty. The state's case, in substance, is that appellant walked into the house and into an inner room where the two deceased parties, Moody and Charles, were sitting in chairs. That it was the residence of Fletcher Glee. That there were present Glee's wife and a woman named Anna Charles. Their testimony agrees substantially that when he walked in the room appellant asked for Alice McFarland. Being informed that she was not in the house, he turned as if starting to leave, and drew his pistol and shot both of the parties; that they were both sitting in chairs at the time. Charles was sick, and Moody was sitting in the chair with his head down, and appellant continued shooting until he killed both of them. It is fairly deducible from the evidence that he did not

intend to kill Charles, but did intend to kill Moody. Defendant's side of the case is that about a year before the homicide Moody in an unprovoked manner shot him two or three times, from which he had recovered, and that Moody had on several occasions threatened to take his life. That he was not aware at the time he went to Glee's house in search of Alice McFarland that Moody was at Glee's. that it was an accidental meeting with Moody, and that when he went in the room he inquired for Alice McFarland, and Moody says, "What in the hell is that to you," and started to the bed on which was a double-barrel shotgun, and he jerked his pistol and shot. The first persons who reached the room found the gun on the bed and the two dead bodies on the floor. It is unnecessary to go into a detailed statement of the evidence. What has been stated sufficiently shows the two theories of the case. The court charged on manslaughter, and the jury gave appellant two years in the penitentiary. So far as the facts are concerned, we do not feel that the court would be justified in reversing the judgment. ·

[8] 6. There were some general exceptions to the charge which point out no particular error. Of course that portion of the motion for new trial with reference to murder in the first and second degrees is eliminated by reason of the verdict. The criticism of the charge on manslaughter is as follows: "Because the court erred in his definition of manslaughter; because the court erred in his definition of self-defense; because the court erred in his definition of imperfect self-defense." These are entirely too general.

As the record is presented to us, we are of opinion there is not sufficient error shown to require a reversal of the judgment, and it is therefore affirmed.